## GEORGE NALIIKIPI KIAKONA *v.* ABBIE W. KIAKONA.

### No. 2471.

Submitted April 14, 1942.                    Decided May 1, 1942.

Kemp, C. J., Peters and Le Baron, JJ.

OPINION OF THE COURT BY KEMP, C. J.
(Peters, J., dissenting.)

This is an appeal by a wife, Abbie W. Kiakona (hereinafter for convenience referred to as "the wife"), from a decree of divorce rendered in favor of her husband, George Naliikipi Kiakona (hereinafter for convenience referred to as "the husband"), and dismissing the wife's cross libel.

The divorce in favor of the husband was grounded on the willful and utter desertion of the husband by the wife. The cross libel was grounded on the failure of the husband to provide suitable maintenance and support for the wife for a continuous period of more than sixty days before the filing of the cross libel.

The wife has appealed from the decree specifying as error that the court erred in finding her guilty of desertion and in finding that she had failed to establish the allegation of nonsupport contained in her cross libel.

If we reach the conclusion that the evidence justified the finding that the wife was guilty of willful and utter desertion for the statutory period, it will also dispose of the alleged error as to the cross libel, as it is well-settled that a wife is not entitled to support if she deserts her husband or lives apart from him without reasonable cause. (*Costa* v. *Costa,* 23 Haw. 381.)

The libelant in a divorce action has the burden of proving the marital offense as laid in the libel as a ground for the relief asked. (*Rogers* v. *Rogers,* 81 N. J. Eq. 479, 86 Atl. 934, 46 L. R. A. [N.S.] 711.) Where, as here, the wife left the home provided by the husband, took up residence with her parents and refused to return except on condition that the husband provide a home other than the one she left, the burden is on the husband to show not only that his wife left him and refused to return but he also has the burden of negativing justification of the wife's conduct. Where, however, both parties have produced evidence bearing upon the issue of willful and utter desertion, all of the evidence must be considered and the issue decided as the evidence preponderates.

The uncontroverted evidence shows that for more than six months prior to the filing of the libel the parties had been living separate and apart; that the wife left the home in Wailuku, Maui, in which she had for a period of about

two months been living with her husband, and since then has been living with her parents in Haiku, Maui; that the home in which they lived in Wailuku was situated on land which belonged to the husband's mother but the house was being paid for by the husband and his sister, and was also occupied by several members of the husband's family; that at first, and for about one month after the marriage, the husband's mother, a sister and a single brother were living in the same home; that after about one month the sister and mother left and a married brother, Charles Kiakona, his wife and child, moved in, but the mother (who had returned to her country home) came back about once a week and would stay from one to two days; that the house consisted of two bedrooms, a sleeping porch, a parlor, a dining room and a kitchen; that the parties to this case occupied one of the bedrooms, but not exclusively, as occasionally the brother's child slept in an extra bed in their room, and others used it as a dressing room. Mrs. Charles Kiakona, the only other woman living in the house, is a cousin of libelee and testified that there had been no trouble between them.

The evidence in chief produced by the husband was sufficient to establish that up until the day before the wife left the home there had been no trouble between the wife and the husband nor with any other member of the household, and no complaint by the wife. Indicative of the wife's intention to remain separated from her husband, a nurse in the hospital where the wife was confined in February, following the separation in October, testified that while in the hospital the wife told her "that her husband thinks she is going back to him but she is not." This was not denied by the wife.

The evidence most favorable to the wife as to what influenced her to leave the home provided by her husband and take up her residence with her parents is her own.

She testified that she had had no trouble with her husband but that about two months after her marriage her husband's mother, while on one of her periodical visits, "crossed me and she wanted to give me a beating," and told her if she ever had her child (the wife was then pregnant) she did not want to see it; that she (the wife) was good for nothing but a troublemaker, "called me names and run me down." She says further that when she and her mother-in-law had the quarrel she turned to her husband and told him to "find a house so we can be by ourselves and he promise me before I go home; he tell me to stay back and I did; he also promised me he would find a home so I pack all my clothes and I leave it there; then one of his best friends brought me home and, in the night, he [the husband] brought my clothes back." She also said in this connection that her husband was on duty the next morning after the trouble and could not take her home; that she asked a cousin or nephew of her husband to take her and her husband seemed to agree; that she did not take all of her clothes and her husband brought her clothes to her that night. Much of her testimony was controverted by the husband and other witnesses.

At the time of the marriage of the parties, on August 12, 1939, and at the time of their separation, on or about October 16, 1939, the husband's income was $90 per month, that being his salary as a police officer of the county of Maui. He was $500 in debt and had no money. It could hardly be said that he was in affluent circumstances.

It is argued that the evidence shows that the wife was justified in leaving her husband and refusing to return to him unless he complied with the condition on which she offered to resume their marital relations.

In *Kui Yin Fong* v. *Wm. S. Fong*, 27 Haw. 823, 825, this court said: "While the taking of a wife to the home of his parents is perhaps not an ideal method of supplying

her with a home, it cannot be said, as a matter of law, that that fact alone justified the wife in deserting her husband." The financial condition of the husband is to be considered and was referred to in the *Fong* case.

In *Ewing* v. *Ewing,* 140 Atl. 37 (Md. App.), the court said: "It has been recognized by this court that grave difficulties in the way of a wife's living in a home maintained by the husband's relatives may justify her leaving the home, and the husband may be guilty of desertion, if in that situation he provides no other home for her. [Authorities.] But the difficulties must be grave. The husband is not required to maintain a home elsewhere, if it is not practicable for him to do so. And, if the wife, without sufficient justification, leaves a home properly maintained by him with his parents, she, on her side, may be guilty of desertion."

There was ample evidence to establish that at the time the wife left her husband she had no complaint as to her husband's conduct other than his taking her to a home owned by his mother and which was also occupied by various of his relatives. The wife admitted that she knew before her marriage that the home to which her husband took her was the only home he had at the time; that she had visited the home when the husband's mother was living there and was shown the room which she and her husband would occupy. Her only complaint dealt with the language used by her mother-in-law upon the occasion of a visit by the mother-in-law to the home, and that consisted of one unpleasant episode the day before the wife left. This clearly was not justification for her leaving. Other evidence which we shall not detail establishes that the husband repeatedly requested the wife to return but the wife consistently refused to do so, and never returned, but only offered to resume marital relations upon the condition that he procure a home of their own. At the con-

clusion of the hearing the circuit judge continued the cause one month to permit the parties to settle their difficulties. When they failed to agree and the case was up for decision, the wife, through her counsel, said: "And for my client I will say that libellee cross-libellant is willing to go and live with her husband in a home of their own." That had been her answer to every request to return home and as a counter offer in lieu thereof.

In view of all the evidence, especially the husband's meager income, his general financial condition and his interest in the home in which the wife refused to live, we think the evidence was sufficient to support a finding that the wife was not justified, as a matter of law, in living separate and apart from her husband, merely because of his failure to provide a home of their own.

It is argued in behalf of the wife, however, that even if her first contention is not sustained, the evidence shows without contradiction that the separation and the continued living apart were with the consent of the husband. The record does not bear out this contention. True, the wife testified, when telling the circumstances of her leaving the home, that her husband "seemed to agree" but she failed to testify to any statement of her husband to the effect that he wanted or was willing for her to live apart from him. He also testified and denied that he, by word or act, gave his consent to the separation. Other evidence of the husband is cited by counsel for the wife as showing that the wife remained away with his consent. He testified that he went to see his wife at her parent's home sometime after she left him and asked her to come back but "she said she won't come back until I get my own home. * * * I told her, at the present time, I don't have enough money to furnish a home and pay rent. I didn't refuse, at any time, to take her back. I just told her if she is willing to come back—*come back to the home but*

*any way stay there at the present time—until I am financially fit; when I was able to financially, I would get a place."* The foregoing statement is interpreted by counsel for the wife as an admission of the husband that he asked her to stay on with her parents until he was financially able to provide her with a home of his own. The phrase "stay *there* at the present time," standing alone, might well be so interpreted but the context makes it reasonably clear that what the husband said was that he asked her to come back *home* and stay *there* until he was financially able to provide her with a home of his own. The record is replete with statements of the husband that he never gave his consent to the separation nor asked her to stay on with her parents until he could afford a home of his own. The circuit judge must have so understood and believed him, though the record discloses no specific finding of fact on this issue. *(Costa* v. *Costa, supra.)* The circuit judge saw the witnesses and heard them testify, and was in a better position than we are to weigh the testimony. "It has long been the rule in this jurisdiction that in cases like the instant one the findings of a trial judge on pure issues of fact are given great weight and should control unless the evidence clearly requires a contrary conclusion." (*Medeiros* v. *Medeiros,* 32 Haw. 177.)

Decree affirmed.

*C. B. Dwight* for appellant.

*E. Vincent* for appellee.

### DISSENTING OPINION OF PETERS, J.

This case, in my opinion, reflects an unfortunate situation. The paramount interest of the Territory in the preservation of the marital status has been flagrantly disregarded. A divorce may only be granted where a statutory ground therefor has been made out by clear and convincing proof. The trial judge was apparently moti-

vated by the philosophy that as long as a reconciliation of the parties could not be effected they might just as well be divorced. And this court, embarrassed by the rule in respect to appeals from circuit judges in chambers, has affirmed the decree of the circuit judge, adopting for its purpose only such of the evidence as appears to give its opinion support.

The evidence at best is meager and unsatisfactory. Outside of the parties themselves, there were two witnesses called, both by the appellee, one his brother Charles's wife, the other the maid in the hospital, the substance of the respective evidence of whom is referred to in the majority opinion. The evidence of the appellee is exceedingly brief. But, although he testified that during the short two-months period within which they lived together prior to her departure in October following their wedding, his wife left him three times and admitted that she had asked him to provide a separate home where they could be alone, by themselves, away from his family, he absolutely failed to show that her disaffection was without cause. He gave no explanation of why she had left him upon the three occasions prior to October, 1939, and, according to him, the cause which led her to leave him in October was innocuous and occasioned by an incident with which she had no concern.

The evidence of the wife is equally brief but apparently from other causes. Her failure to understand the simplest questions propounded to her, her responses thereto, and her manner of testifying, showed her to be timid and lacking in ordinary understanding and powers of expression. On cross-examination by opposing counsel, she protested that this outburst of her mother-in-law which precipitated her return to her own parents was not the only reason for her leaving but that there were other reasons. She testified "They were always making com-

plaints about me living there and telling things about me. * * * his family, his brothers and sisters, said things that - - * * * His brothers and sisters said things * * * she [the mother-in-law] said things that hurts my feelings a lot; * * * she said other things too." This admittedly is not particularly satisfactory. But she was undoubtedly attempting to convey the thought that the October incident was not the only occasion when her then condition was made the subject of vilification and abuse by members of her husband's family.

As I view the evidence, it is the simple case of the victim of illicit relations taken after marriage to the home of her husband, which she shared in common with other members of his family, and there left to shift for herself and to bear as best she could the family's implications and insults which her condition excited. She was then approximately nineteen years of age. Her husband's home was apparently a family rendezvous. If things were going along so well with these people, is it not passing strange that the existing amicable relations were so abruptly terminated by a wife whose desire was not to suspend cohabitation but to continue cohabiting with her husband elsewhere than in the family home?

As I read the authorities, while the prerogative reposes exclusively in the husband to select the marital domicile, this power must be reasonably and not arbitrarily exercised[1] and such selection must be made with due regard for the welfare, comfort and happiness of the wife.[2] In other words, the marital domicile selected must be a suitable one, measured by all the surrounding facts and cir-

---

[1] *Neville* v. *Neville*, 220 Ala. 57, 124 So. 107; *Spafford* v. *Spafford*, 199 Ala. 300, 74 So. 354-356; *Brewer* v. *Brewer*, 79 Neb. 726, 113 N. W. 161; *Hall* v. *Hall*, 69 W. Va. 175, 71 S. E. 103.

[2] *Thomsen* v. *Thomsen*, 118 Ore. 614, 247 Pac. 808; *Rood* v. *Rood*, 117 Pa. Super. 291, 178 Atl. 173, 174.

cumstances of the particular case.[3]   The refusal of the wife to live in the marital domicile provided by the husband does not constitute statutory desertion, where the domicile selected is not a suitable one.   Whether or not the marital domicile selected is a suitable one is influenced by many considerations, one of which may be the presence in the household of the relatives of either of the spouses. It is a matter of common knowledge that the presence of "in-laws" in the marital domicile is a prolific source of grief.   The wife has the right to expect to be provided with a home in which only the parties to the marital relations reside and over which she is the mistress.   There are many conceivable reasons, cogent in themselves, for parents being included in the family menage; similarly, brothers or sisters or their children.   In the instant case, however, it does not appear that the husband's relatives were being supported by him or that any reason existed for their presence or his living with them, except for the convenience of the parties involved.   But if the husband insists that his wife live with him in a marital domicile in which other members of his family reside, the latter must so conduct themselves toward the wife that her welfare, comfort and happiness are not unduly disturbed. And where it appears that as a proximate result of their presence the welfare, comfort and happiness of the wife, without fault on her part, are unreasonably disturbed, thereby rendering the home unsuitable, the wife may, without being guilty of statutory desertion, suspend cohabitation and impose as a condition to its renewal the removal of such relatives from the marital domicile or the establishment of a marital domicile elsewhere, where the parties may live by themselves.[3a]

---

[3] *Loughney* v. *Loughney*, 111 Pa. Super. 214, 169 Atl. 460; *Damm* v. *Damm*, 82 Mont. 239, 266 Pac. 410.

[3a] *Thomsen* v. *Thomsen*, 128 Ore. 622, 275 Pac. 673, 675; *Rood* v.

I do not consider the case of *Ewing* v. *Ewing* authoritative, the rule therein enunciated being influenced by the Maryland statute.

Moreover, there is evidence to which the majority opinion does not refer, which in my opinion is decisive of the merits and makes it obligatory that the decree be reversed; that is the undisputed evidence of the wife, admitted by the husband, that after their separation in October, 1939, she repeatedly solicited resumption of cohabitation. And it is upon this evidence that appellant assigned as error the failure of the appellee, libelant below, to show that she had left him with the intention never to return. In my opinion the assignment is well taken.

To constitute statutory desertion it is not enough that it appears that the wife lives separate and apart from the husband for the required period. In the absence of evidence to the contrary, the law presumes that such separation is with the consent of the husband. In order to constitute statutory desertion, it must further appear that the wife deserted the husband without just cause, with the intention not to return nor to resume cohabitation.[4] The statute requires that the desertion be "utter" and "wilful."[5] The plain meanings and implications ascribed to the respective words, "utter" and "wilful," require that the desertion be voluntary and without justification, with the design and purpose to terminate cohabitation and never to return.[6] Further, it is undisputed that not alone

---

*Rood*, cited *supra* note 2; *Horkheimer* v. *Horkheimer*, 106 W. Va. 634, 146 S. E. 614; *Hughes* v. *Hughes*, 113 W. Va. 698, 169 S. E. 403; *Marshak* v. *Marshak*, 115 Ark. 51, 170 S. W. 567; *Field* v. *Field*, 139 N. Y. S. 673.

4 *Hall* v. *Hall*, *supra*; *Mikolojczak* v. *Mikolojczak*, 283 S. W. 328 (Tex. Civ. App., 1926).

5 "For wilful and utter desertion for the term of six months." R. L. H. 1935, § 4460, par. 2.

6 *Hanover* v. *Hanover*, 34 Ohio App. 483, 171 N. E. 350; *Billion* v. *Billion*, 137 Ore. 622, 1 P. (2d) 1108, 1111.

60

did the wife repeatedly solicit of the husband the renewal of cohabitation but her last entreaty to live together in a home of their own, to accomplish which she had secured a house for the modest monthly rental of ten dollars, was under advisement by the husband when he filed his libel for divorce. Upon this last occasion he told her he would let her know on the following Monday. His only answer was the filing of the libel.

It was incumbent upon the appellee to show that the desertion was "utter" and "wilful." In this he absolutely failed. Up to the time the libel was filed the wife had never unequivocably refused to return to him and resume cohabitation in his own home. On the contrary, negotiations which had for their object the resumption of cohabitation were pending at the time that the libel was filed. In divorce proceedings strict proof is required of the statutory ingredients of the offense charged. In a case of statutory desertion the "renunciation of him [the husband] must be fully and clearly shown."[7]

The decree appealed from should be reversed and the libel dismissed. This disposition of the case would carry with it the retaliatory cross libel.

---

[7] *Horkheimer* v. *Horkheimer, supra;* See also *Reynolds* v. *Reynolds,* 68 W. Va. 15, 69 S. E. 381-383.