LENORE HARBERT, *an Infant, etc. v.* ROBERT RAY HARBERT

(No. 9080)

Submitted September 10, 1940. Decided November 19, 1940.

*A. J. Rosenshine* and *Edward M. Baker,* for appellant.

KENNA, JUDGE:

This appeal was granted from a decree of the Circuit Court of Harrison County entered on the fourth day of November, 1939, in a divorce proceeding in which Lenore Harbert, infant, by Mary Virginia Marsh, her next friend, is the plaintiff and Robert Ray Harbert is the defendant. The final decree dismissed the bill of complaint and also the answer of the defendant in the nature of a cross-bill seeking affirmative relief and praying for a divorce from the bonds of matrimony, the plaintiff being the appellant. Both the bill of complaint and the cross-bill seek relief based upon cruel and inhuman treatment, there being

in each detailed allegations of physical violence, abusive and profane language and overbearing conduct. A special reply in writing was filed by the plaintiff in which she denied all of the material allegations of the defendant's cross-bill.

The conduct of this proceeding became regrettably acrimonious, and both the pleadings and the proof developed into detailed criminations and recriminations—verified charges and denials—so that it is virtually impossible to state clearly more than the salient features of the controversy.

The parties were married on the twenty-sixth day of June, 1933, in Ritchie County when the plaintiff-wife was sixteen years of age and the defendant-husband nineteen. Harbert was then employed as a private chauffeur and was earning one dollar and fifty cents a day. Being unable to provide a separate domicile, it was understood that the couple would live with Harbert's parents in Salem, Harrison County, but that when his earnings permitted he would provide a separate home. This understanding was carried out so far as their immediate residence was concerned, the home of Harbert's parents being what is spoken of as a one and one-half story dwelling, the young couple occupying a single room on the second floor which was partly used by the other members of the household for storage. Fifteen dollars a month was paid as rent.

In the early spring of 1937, plaintiff had an attack of influenza accompanied by a loss of weight, partial anemia and a hacking cough. She also developed an acute nervousness that seems not to have characterized her prior to her illness.

She had complained for sometime prior to this illness that her mother-in-law restricted her use of the home and would not permit her to receive visitors. She therefore spent a great many of her evenings at the home of her parents, her husband after the first year of their married life being engaged as an insurance salesman and practically every evening using an automobile which he had purchased to solicit business.

Harbert would drop by for his wife at her parents' home in the neighborhood of ten o'clock. According to Mrs. Harbert, if she delayed him for only a few moments he would become violently abusive and profane. She states that he struck her many times. A sister of the plaintiff testified that Harbert on more than one occasion by inference proposed an illicit relationship which she declined, saying nothing to her sister about it.

On the other hand, the husband's testimony is to the effect that he continued as a chauffeur during their first married year, but that upon the illness of his father, who represented the New York Life Insurance Company as a salesman, he took over his father's business, purchased a necessary automobile and with his earnings was able to provide his wife with spending money, clothing and to maintain her at his parents' established home. He and his parents denied that his wife's use of the house was restricted, and stated that the use of their bedroom was entirely private and that the other parts of the house were open to all persons living in it. He testified that his wife was quarrelsome, irritable, abusive and on several occasions struck him with her fist. His sister testified that at the home of their maternal grandmother, a brother of their mother, age fifty-seven, on several occasions in the presence of her grandmother, her mother and herself engaged plaintiff in lewd conversation and retired with her to a bathroom where, with the door closed, they remained for ten or fifteen minutes. Defendant's mother testified to the same effect. Plaintiff denies it emphatically.

The uncle of the defendant was subpoenaed by the plaintiff at the close of the taking of the depositions and he responded, but was not put on the stand. There is nothing in this record, save the statement of plaintiff's counsel, to indicate what his testimony would have been. The divorce commissioner took no definite position with relation to this witness, and apparently exercised no initiative to discover which statement was false and the origin of the palpably perjured testimony. Extreme bias and prejudice on the part of witnesses may be condoned,

but flagrant perjury should, under no circumstances, be tolerated. It is the plain duty of a divorce commissioner to exercise control over the proceeding when necessary and, as the representative of the state, to take the ascertainably necessary steps to see that perjury is exposed and the "true facts" determined. He should "take all necessary steps to *prevent fraud* and collusion." (Italics supplied.) Code, 48-2-24. We are of the opinion that the trial chancellor's decree was prematurely entered and that the disposition of the case should have been held in abeyance while an investigation of the numerous categorical contradictions and denials in the testimony was conducted by the divorce commissioner.

The principal cause for the minor contentions that arose to mar the marital relationship of this young couple was their lack of agreement in determining their place of abode, the wife contending that it was a hardship and the cause of much humiliation and distress for her to continue to reside in her husband's parents' home, and that for her to do so was a departure from the agreement and understanding they had when they were married. Harbert admits the understanding, denies that his net income equaled or approached his wife's assertion, and contends that he did whatever lay in his power to provide her with a home independent of that of his parents. This record is replete with detailed testimony tending to sustain each of the two contentions, Mrs. Harbert testifying that Harbert frequently said that married life interferred with his business, demanded that she institute a divorce proceeding and made no effort to provide her with a separate home, fully realizing the detrimental effect that staying with his parents was having upon her health, and even refusing to furnish her with necessary medical attention until in this proceeding she procured an order directing him to pay the expense of an appendectomy and a tonsilectomy to which she submitted after the separation. Harbert's contention is that he did provide his wife with adequate medical attention and that up until the time of their separation, they were advised by a competent phy-

sician that her condition was the result of a slow convalescence from the attack of influenza that she had had in the previous spring, and that it was only after they had separated that the necessity for surgery developed, which he provided for without hesitation.

Harbert says furthermore that he made inquiry of two different real estate firms concerning the renting of an apartment, one connected with a restaurant and the other connected with a room in which Mrs. Harbert could have conducted a beauty parlor, but that Mrs. Harbert was not in sympathy and that what she wished was to purchase a separate residence beyond his means. He also negotiated for the purchase of a house without success. To substantiate his contended attitude, he introduced testimony that he had purchased a Kelvinator, some bedclothing and aluminum cooking utensils with the confident expectation that it would be but a short time until he and his wife would put them to use.

Usually, the husband has the undoubted right to select the couple's place of abode, but considering all of the surrounding circumstances, including the husband's means, this right must be equitably exercised and not used to inflict suffering upon the wife. *Hall* v. *Hall*, 69 W. Va. 175, 71 S. E. 103, 34 L. R. A. (N. S.) 758. Where a husband heedlessly imposes upon his wife in selecting a place of abode or otherwise, causing her mental distress so that her health is impaired to such an extent that a separation results as the natural consequence, the husband will be presumed to have intended a separation and be charged therewith. *Horkheimer* v. *Horkheimer*, 106 W. Va. 634, 146 S. E. 614. The report of the commissioner in chancery, affirmed by the trial chancellor's decree, contained no specific finding as to whether the husband fulfilled his marital duty in furnishing a place of abode, but it does report that he did not take the necessary corrective measures concerning the plaintiff's impaired health and that he did overlook or neglect his marital duty in that way. It is our opinion that the commissioner in chancery should have reported specific findings of fact upon which his recom-

mendations should have been based. *Crim* v. *Post,* 41 W. Va. 397, 406, 23 S. E. 613. Otherwise objections to a commissioner's report cannot be sufficiently specific.

The decree of the Circuit Court of Harrison County is reversed and the cause remanded for further development, including further investigation by the divorce commissioner and further findings of fact by the commissioner in chancery.

*Reversed and remanded.*